## McMillin's Administrator v. Bourbon Stock Yards Company.

(Decided February 5, 1918.)

Appeal from Jefferson Circuit Court
(Common Pleas Branch, Third Division).

Negligence—Children—Attractive Nuisance—Care to be Exercised by Owner of Premises.—The owner of premises where there are dangerous places, appliances, or machinery, attractive to children, is under a duty to take reasonable precautions for the safety of trespassing children, considering all the surrounding conditions and circumstances; but he is not required to keep gates that are on his enclosed premises continually locked, or to build his fences so high that no person can climb over them, or to have his servants continually on the lookout.

SAMUEL TRUSTY and CHARLES REISCH for appellant.

HUMPHREY, MIDDLETON & HUMPHREY for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Affirming.

In the southwest corner of the Bourbon Stock Yards at Louisville the stock yard company maintained quarantine pens in which were put cattle suspected of being diseased. On one side of these quarantine pens there was what is known as a cattle dip, consisting of a concrete trough about forty feet long, three and a half feet wide and placed below the level of the ground. This trough was filled with a solution composed of water and other ingredients prescribed by the government, and cat-

tle with tick and perhaps other diseases would be driven into this concrete trough and through the solution it contained, which at places was deep enough to submerge the cattle and cause them to swim.

These quarantine pens were enclosed by a solid fence, and the cattle dip was also enclosed by a separate slat fence. On one side of the pens there was an alley between Market and Jefferson streets which passed directly into the stock yards. In this alley there was a gate leading into what was called a runway inside the quarantine pens and another gate leading from this runway into the ground where the cattle dip was located.

These gates, which were usually closed, were at times left open, so that boys who found their way into the alley, as they could do from the street on which it opened, could then go into the quarantine pens and into that part of the pens in which the cattle dip was located by going through the gates before mentioned, if they were open, or by climbing over them or the surrounding fences, if the gates were closed; and it is shown that a number of boys in the neighborhood were in the habit of playing from time to time in the stock yard premises, as well as in the quarantine pens, and about where the cattle dip was located.

In October, 1914, Eugene McMillin, a little boy about six years old, in company with Frank Shipman, another little boy about the same age, went through the alley, and finding the gates open, they went into the quarantine pens and were playing about the cattle dip. After getting to the cattle dip one of them stood on one of the concrete walls that had been made on each side of the dip, while the other got on the opposite wall, and here they were playing by pitching a toy gun across the dip from one to the other. While so engaged the gun fell into the dip and Eugene McMillin, in an effort to get it, also fell into the dip, and soon afterwards died from the effects of the poisonous water which he swallowed.

Subsequently this suit was brought by his administrator to recover damages for his death upon the ground that the cattle dip was an attractive place for children and not sufficiently protected, and after the conclusion of the evidence in his behalf, the trial court took the case from the jury, and the administrator appeals.

There is evidence by a number of boys from eight to fifteen years old that they played in the stock yards, the

quarantine pens and about the dip many times; that sometimes they would go on the premises by climbing over the gates or the fences, and at other times the gates would be open and they would go through that way. It also appears from the evidence that whenever the superintendent or any of the employes of the stock yard saw the boys, they would run them out, but at times they would play about the premises for some little while before being observed by the stock yard people.

As illustrating the efforts made to keep boys out and the ways in which they got in, we may refer briefly to the evidence.

Arch Burch, superintendent of the stock yards company, introduced as a witness for the plaintiff, said that there was an alley on the north side of the pen leading from Wenzell street into the stock yard; that there was a big gate at the end of the alley in the stock yard and also a smaller gate through which people could go; that he had been in charge of the stock yards for a number of years and had seen children playing in the grounds but they were always run out when discovered; that in order to get to their dipping pens from the alley a person had to go through two gates.

Thomas Lawson, an employe of the company, said that he had seen boys in the quarantine pens frequently and always ran them out; that he had instructions to do so from Mr. Burch, the superintendent, and did the best he could to keep them out, although it was right difficult to do it; that it was the practice to keep the gates closed and fastened.

Jeff Darringer, another employe of the company, introduced by the plaintiff, said that whenever they saw boys in there they had orders to and did run them out.

Birdie Hall, who lived in a house a couple of hundred feet from the quarantine pens, said she had seen boys playing in the grounds many times; that she saw these two little boys go into the quarantine pens on the day Eugene McMillin lost his life; that when they went in the gate leading from the alley into the pens was open, and they went through the gate.

On this evidence the argument is made that as the quarantine pens and stock yard premises were attractive places for children to play in and the cattle dip a dangerous place, the stock yard company was under a duty to so enclose and protect the cattle dip as to prevent chil-

dren from playing about it and thereby putting their lives in peril.

We have written a number of cases on the subject of the duty of the owners of attractive and dangerous premises to protect them from trespassing children, and have extended what is known as the attractive nuisance doctrine possibly farther than, and certainly as far as, any other court whose opinions have come under our observation; but we do not think the principle announced in Branson's Admr. v. Labrot, 81 Ky. 638; Lyttle v. Harlan Town Coal Co., 167 Ky. 345; Miller v. Chandler, 168 Ky. 606, can be applied to the facts of this case. The cattle dip into which this little boy unfortunately fell was on the private premises of the company, enclosed not only by one but by two fences, reasonably sufficient to keep out intruders.

It is true that there was a gate leading from the alley into the runway, separated from the dip by a solid fence, and at each end of this runway there was a gate leading into the place where the dip was located; and there was some evidence that one or perhaps both of these gates were open at the time these children went from the runway into the enclosure where the dip was located.

But we think that when the owner of private premises, although there may be on these premises a dangerous place attractive to children, has his premises enclosed by a fence so constructed as to reasonably prevent children from climbing over it, he is not to be held liable for accidents that happen to trespassing children who find a roundabout way to get into the premises and then happen to find a gate that is open and through which they go to the place of danger.

As said by the lower court in a brief opinion, the evidence in this case "further shows that practically the only dangerous place that has been made known here is the cattle dip; and it further shows that the dip was surrounded on all sides with a fence and beyond that by other fences around the cattle sheds. Now it seems to me that when a man protects his property in that way, he has exercised in full the duty which the law imposed upon him in exercising ordinary care to protect them from intrusion, and if, notwithstanding his protection, people go in there and get injured, they assume the risk and not he. To hold otherwise would be, it seems to me, to say that a man using property in a large city for manufacturing purposes, or using dangerous machinery of

any kind, or having appliances from which danger might be incurred by people coming in contact with them, would be absolutely powerless to protect himself.''

Everybody who has any acquaintance with the habits of children knows how difficult it is to keep them out of enclosures inside of which there are suitable playgrounds, or indeed any kind of ground on which children can run and romp, or where there are things that are attractive to children. And so the law in its tender regard for the safety of children and in an effort to protect them from being hurt by the dangerous places, appliances and machinery of one kind and another that may be found in premises where children are in the habit of going or where they might be attracted to go, puts on the owner of such premises a duty that he does not owe to adults. But this duty does not go to the extent of making the owner an insurer of the safety of trespassing children. It only requires him to take reasonable precautions for their safety, and among these precautions are the duty of warning and notice as well as the duty, in some instances, of protecting by barriers, and especially are these last precautionary measures required at places where children are permitted, without objection, to go and play.

But the owner need not keep gates that are on his enclosed premises continually locked, and need not build his fence so high that no person can climb over it; nor is he required to have servants continually on the lookout for trespassing children. He need only exercise reasonable care, considering all of the surrounding conditions and circumstances, to prevent trespassing children from being hurt by the dangerous things he may have about his premises, and this we think the stock yard company did.

In cases like this it is very often difficult to draw with precision or clearness the line between the cases holding the owner of the premises liable and the cases holding him not liable, but we think this case must be put with the cases of Thompson v. Cumberland Telp. & Telg. Co., 138 Ky. 109; Hermes' Admr. v. Hatfield Coal Co:, 134 Ky. 300, and Mayfield Water & Light Co. v. Webb's Admr., 129 Ky. 395, and the judgment of the lower court is affirmed.