## Young's Adm'r v. Mahan-Jellico Coal Company.

(Decided Jan. 12, 1934.)

J. B. JOHNSTON and R. L. POPE for appellant.

TYE, SILER, GILLIS & SILER and T. E. MAHAN for appellee.

OPINION OF THE COURT BY JUDGE PERRY—Affirming.

Roy Young, an eleven year old boy, while riding with some older boys in a tunnel of the appellee coal company upon one of its electric motors, fell and was crushed and instantly killed thereunder.

In this action by his administrator to recover damages for his death, the trial court, at the conclusion of plaintiff's testimony, sustained the motion of the defendant for a directed verdict, and a new trial having been denied, the administrator appeals.

Appellant by counsel presents and argues only one ground for the reversal of the judgment, which is that the court erred in sustaining the motion of defendant for a directed verdict. In support of such contention, he insists that the evidence introduced showed the case to be one coming within the doctrine of an attractive nuisance and controlled by the applicable rule of liability therefor. Thus the only question here presented for our review and determination is whether or not the attractive nuisance doctrine is here applicable. To correctly determine this, or whether the appellee is liable under the rule of this doctrine, it is necessary to get a clear outline of what is claimed to have here constituted the attractive nuisance and to understand just what were the alleged negligent condition of the premises and dangerous and attractive instruments shown by the evidence to have been used and employed by the appellee (defendant below) thereon, as the owner and in control thereof.

The case as made out for the administrator by the testimony of his witnesses is substantially as follows: Roy Young was at the time of his accidental death living with his father and stepmother upon the mining property of the appellee coal company at Packard, Whitley county, Ky., where the latter owned and operated its coal mining business as the Mahan-Jellico Coal Company. The house in which Roy Young lived be-

longed to the appellee mining company and was but little distant from the entry to its mines and also to the entry to its tunnel wherein it had and used a storage track for storing certain of its unused cars and electric hauling motor thereto attached, when not needed for coal transportation about the mines.

The evidence shows that this tunnel had been made by the company some years before and tracks laid therein for the purpose of a connecting roadway and for removing the coal from another of its nearby mines, but that this farther mine had been abandoned about two years prior to Roy Young's death, since which time the tunnel and its tracks had been used by the appellee merely as a convenient storage place for its unused cars and motors. Also, it appears that the company owned some four or five hundred of these small bank cars and some six electric, six-ton, haulage motors, which it employed in its mining operations in the hauling of the mined coal from out its mines to the tipple where they were unloaded, when the empty cars would be then carried therefrom for storage upon the nearby tunnel tracks if they were not to be again soon needed in the mine.

The evidence further shows that the appellee coal company has a motor barn at its plant, which holds about six motors, this barn being equipped with doors that can be locked; also, that these electric motors are operated by placing the trolley pole on the electric wire and opening up the control, which makes contact with the electric power and pulls the motor forward or backward at the will of the operator; that the electric current is distributed throughout the mine by wires attached to the roof; and that the current can be turned on or off by a switch at the drift mouth or entrance. Also it shows that it is impossible to operate one of these motors if the control or reverse is removed or while the electric current is switched off or if the trolley pole is locked down to the motor, and that any one of these things could be done within a few minutes and at little or no expense.

On the particular occasion in evidence, it appears that Mr. Oliver, a motorman for the company, had late in the afternoon of December 11, 1931, according to the appellant, driven a motor, to which there were attached about sixty cars, each car being nine or ten feet long, off the main line and into this side entry or tunnel situ-

ated within a few feet of the main line and had left the motor and cars underground about fifty car lengths therein, and that such was the usual means of storage of its unused cars and motor; that the motor was left with the trolley pole attached to the trolley wire; and that the switch controlling the electric current on the trolley wire was cut off at the drift mouth or tunnel entrance. Also it appears that this tunnel was about eight hundred feet in length and extended through a side of the mountain ridge with an opening or portal at either end. Also it appears that within about one hundred feet of the farther end of the tunnel, several tons of slate had fallen over the tracks, so blocking and obstructing them as to render it impossible to drive a motor over or beyond such slate obstructed part of the tracks; that Mr. Oliver, in bringing the motor and attached fifty-odd empty cars into the tunnel, upon this occasion had driven the motor to the point therein where it reached the fallen slate and had there stopped and left the motor and empty cars until they would be again needed, when it is shown another electric motor would be coupled to the other or rear end of the train and the cars and attached motor pulled out of the tunnel; that such method of taking or thus pulling out the stored motor and cars out of the tunnel was necessary because of the uneven and curved condition of the tracks, which made it impossible for the motor pulling them in to again back them out; and that upon thus leaving the motor and attached cars, the motorman had come out of the tunnel and switched off the electric current at the entrance switch located six feet above the ground.

The evidence thus shows that upon this occasion the coal company had stored for the night an electric haulage motor attached to some fifty-odd empty coal cars within this narrow and low, eight hundred foot tunnel on the mountain side, where there is no evidence that children had ever before congregated or played, and had thus left the motor at a distant point therein where several tons of slate had fallen on the tracks so as to prevent its forward movement, while behind it the fifty-odd cars, attached and standing on a curving and sagging track, prevented the backward movement of the cars, with the result that in order to reach the motor so stored, or to use it, these vagrant boys or children had to go in the dark of the night through a narrow

tunnel eight hundred feet long, crawl over some fifty-odd mine cars, with the aid of only such light as they might themselves then have, and when the motor was finally reached find it so obstructed that it could not then be moved or run, so as to become a dangerous instrument stored upon the premises, without the effort and further labor of first removing several tons of fallen slate from in front of the motor which then blocked its forward movement.

The evidence further shows that on the evening in question the deceased, Roy Young, left his home about 6 o'clock, with the permission of his father, for the purpose of attending church service held in a vacant house owned by the defendant company about one-half mile distant; that he there met five or six older boys, when it was suggested that they leave church, go to the tunnel, and there ride upon the appellee's motor and empty coal cars stored therein; that the deceased, Roy Young, who then had a carbide light, and his companions entered the mouth of the tunnel, when one of the larger boys turned on the entrance switch on the trolley wire, and then all got up in the cars and climbed from one car to another for the length of the train of some fifty-odd cars, until they reached the motor, when, finding that they could not move it forward or backward, they proceeded to remove the several tons of slate from off the tracks; and when this job was finished they uncoupled the motor and one car from the other cars, and two of the boys, Barnett and Earl Bryant, who were fifteen or sixteen years of age, proceeded to operate and, with the others, ride the motor and car up and down the short distance of cleared track. It does not appear that deceased ever attempted or could himself operate it. After riding backward and forward for awhile, until they thought church was about over, they decided to take the motor and car back to the other cars and then go out of the mine through the nearer back entrance. Upon this return trip Roy Young and Earl Bryant were on the motor and Shirley Blevins, another one of the crowd, rode in the attached car. Roy sat on the motor with his feet on the attached car. In some way the coupling pin between the motor and the car worked out, with the result that when they started downgrade, the car, it appears, rolled faster than the motor and thus pulled away from it, when the deceased, probably because the support for his feet was removed,

fell in front of the motor, which ran upon him and crushed him beneath its six-ton weight, killing him instantly. The other two boys tried to get him out and spoke to him; when receiving no answer, frightened, they ran off and left the deceased under the motor. The boy's body was found by the motorman the lext morning, after he had pulled the train out of the tunnel without the stored motor following with them. Upon then going back into the tunnel to discover why the motor had not also come out, he found it uncoupled from the cars and the deceased boy's crushed body beneath it.

Upon these facts shown by the evidence, it is the appellant's theory that the appellee maintained, in thus storing its motor and empty cars, an attractive nuisance to infant children and thereby permitted them to go upon its premises and use and play with its motors and bank cars without exercising ordinary care to prevent injury to them while as trespassers operating and using these alleged dangerous instruments which, for the operation of its business, it in such manner maintained upon its premises. Therefore he contends that the trial court erred in sustaining defendant's motion for a directed verdict.

Appellant thus bases his right to recover on the "turntable" cases or the "attractive nuisance" doctrine. Many prior cases involving this court's construction and application of that doctrine have been before it, wherein the origin and humane principle of the rule, together with its qualifications, have been considered and elaborately discussed. We deem it, therefore, unnecessary to here again discuss the same at length, but for a thorough exposition and annotation of the doctrine reference is made to the case of United Zinc & Chemical Co. v. Van Britt, 258 U. S. 268, 42 S. Ct. 299, 66 L. Ed. 615, reported and annotated in 36 A. L. R., pages 28 to 294, inclusive; and also to the case of Henry Smith v. Walker D. Hines, Director General of Railroads, 212 Ky. 30, 278 S. W. 142, reported in 45 A. L. R. 980, with supplemental annotation thereto upon "attractive nuisances" at pages 980 to 993, inclusive; and again to the case of Louisville & N. R. R. Co. v. Ludie Hutton, 220 Ky. 277, 295 S. W. 175; see also the case of J. R. Cox, Adm'r, v. Alabama Water Co., 216 Ala. 35, 112 So. 352, also reported together with further extended supplemental annotation upon "attractive

nuisances'' in 53 A. L. R., pages 1328 to 1356 inclusive, and 20 R. C. L. pages 80 to 83 inclusive and page 103.

As shown by the authorities cited supra, this court has repeatedly applied the "turntable" or "attractive nuisance" doctrine, and sustained a recovery thereunder in numerous cases, to the facts of which it was held applicable.

In the case of Coon v. Ky. & I. T. R. Co., 163 Ky. 223, 173 S. W. 325, 326, L. R. A. 1915D, 160, the court in considering this attractive nuisance doctrine said:

"In Bransom's Adm'r v. Labrot, etc., 81 Ky. 638, 50 Am. Rep. 193, the defendant owned a vacant lot between two streets in Frankfort. The lot had been used by the public for a number of years. Defendant used it for stacking lumber. One of the piles of lumber was negligently stacked. Plaintiff's intestate, a little boy, while playing on or near the unsafe pile of lumber, was struck by the falling lumber and killed. In the case of Harper v. Kopp, 73 S. W. 1127, 24 Ky. Law Rep. 2342, the defendant, without permission from the city, left a pile of lumber stacked in the streets. A child of six years of age, while playing about the lumber, was injured. A recovery was allowed because the defendant stacked the lumber in a public street, where its unguarded condition made it attractive and dangerous for young children. In the case of Louisville Railway Co. v. Esselman, 93 S. W. 50, 29 Ky. Law Rep. 333, the railway company stacked, in one of the streets of Louisville, certain building materials to be used in the reconstruction of its power plant. Part of the materials consisted of heavy iron I-beams. While a boy 11 years of age was playing on the beams, one of them fell over and injured his leg. Judgment in favor of the boy was affirmed on the ground that the material was so negligently stacked as to constitute a dangerous instrumentality. A recovery was also allowed in Brown v. C. & O. Ry. Co., 135 Ky. 798, 123 S. W. 298, 25 L. R. A. [N. S.] 717, which was a typical turntable case."

Yet, though the court approved the principle of these cases, it held that appellant had not brought his case within the doctrine of them.

On the other hand, recovery under this doctrine

was denied in McMillin's Adm'r v. Bourbon Stock Yards Co., 179 Ky. 140, 200 S. W. 328, 329, L. R. A. 1918C, 682, where a little boy six years old had found a roundabout way to get into the premises of the stock-yard company through an open gate and had fallen into a tank. The case was held not to come within the doctrine making it liable for negligence upon the grounds that an owner need not keep gates continually locked or build his fence so high that no person can climb over it, nor is he required to have servants continually on the lookout for trespassing children, but is only required to exercise reasonable care in view of all circumstances. The court, in the course of its opinion delivered by Judge Carroll, said:

> "We have written a number of cases on the subject of the duty of the owners of attractive and dangerous premises to protect them from trespass-ing children, and have extended what is known as the attractive nuisance doctrine possibly farther than, and certainly as far as, any other court whose opin-ions have come under our observation; but we do not think the principle announced in Bransom's Adm'r v. Labrot, 81 Ky. 638, 50 Am. Rep. 193, Lyttle v. Harlan Town Coal Co., 167 Ky. 345, 180 S. W. 519, and Miller v. Chandler, 168 Ky. 606, 182 S. W. 833, can be applied to the facts of this case. The cattle dip into which this little boy unfortunate-ly fell was on the private premises of the company, inclosed not only by one but by two fences, reason-ably sufficient to keep out intruders. * * *

> "And so the law in its tender regard for the safety of children and in an effort to protect them from being hurt by the dangerous places, appli-ances, and machinery of one kind and another that may be found in premises where children are in the habit of going, or where they might be attracted to go, puts on the owner of such premises a duty that he does not owe to adults. But this duty does not go to the extent of making the owner an insurer of the safety of trespassing children. It only re-quires him to take reasonable precautions for their safety, and among these precautions are the duty of warning and notice as well as the duty, in some instances, of protecting by barriers, and especially are these last precautionary measures required of

places where children are permitted, without objection, to go and play.''

In the instant case, however, the evidence shows that not only had the children of this mining camp not been invited or permitted to go upon the company's motors or cars, either while they were in use or idle, but, that on the contrary, whenever they were discovered thus trespassing upon these cars or motors they were reprimanded and scampered away to places of hiding, for they fully understood that they were prohibited both by the rules and the practice of the mining company from going about or upon their motors and cars wherever found by them, whether within or outside of the mines. Also, there is no evidence whatsoever that either the deceased Roy Young or any of the other mining camp children, of which there appear to have here been some fifty boys between the ages of six and sixteen, had ever, previous to the occasion in evidence, gone into or played within this storage tunnel of the defendant or had gone upon its cars or attempted to use the motor stored therein, or that the company had any reason to expect or anticipate that they would go or congregate therein, or that it had by such children been regarded as an attractive place in which to play or as harboring an attractive instrument therein. Certainly the facts and circumstances here shown by the evidence cannot reasonably be regarded as coming within the humane attractive nuisance doctrine, whether based upon the theory of implied invitation (even when expressly prohibited) to children of tender years to come upon the owner's premises by reason of its placing and exposing thereon machinery, cars, or other dangerous yet attractive instruments to children, or whether the doctrine be treated as an exception to the general rule, as stated in the case of Lyttle, Adm'r, v. Harlan Town Coal Co., 167 Ky. 345, 180 S. W. 519, 520, exempting the owner of premises from liability for injuries received by trespassers thereon. This general rule, as set out in the Lyttle Case, supra, is:

"Leaving out of view the 'attractive place' doctrine, the rule is that under ordinary conditions trespassing children occupy the same attitude as trespassing adults, thus imposing on other persons only the duty of exercising ordinary care to prevent injury to them after their peril has been discovered. This is a rather harsh doctrine, but it is

firmly fixed as the law of this State by numerous decisions, and is also the prevailing rule announced by courts generally.''

It is very often difficult to draw with precision the line between the cases holding the owner of the premises liable and the cases holding him not liable; but we think this case, in that its admitted facts do not fairly or reasonably bring it within the rule and doctrine of the turntable cases, must be held to come within the general rule of the nonliability of the owner for injuries received by those while trespassing upon his premises, and even more readily do we so conclude where the facts, as here, are such that we perceive no failure on the part of the appellee to exercise an ordinary care for the safety of children of tender years who might trespass upon the storage tracks of its tunnel, or that it had cause to anticipate their trespassing. Its electric motor and cars stored therein for the night under the circumstances stated, where they could not be moved or run either way by trespassers seeking to so amuse themselves, did not constitute the placing of a dangerous and attractive instrument so publicly upon their premsies as served as an implied invitation to children below the age of discretion to enter the tunnel and hazard their safety by playing with the dangerous machine or instrument therein concealed. The machine was not dangerous within itself or when left in such immovable position, nor was it attractive to children when stored some hundred feet out of view within the depths of the tunnel. When so hidden from view, it was not a public or attractive nuisance as was the condition presented in the cases cited supra. The appellee company was not an insurer of the safety of all children who might trespass upon its property, but its duty under the attractive nuisance doctrine was only one requiring it not to place or install attractive and dangerous instruments upon its premises as would invite and lure children of tender age to their hurt.

We are for these reasons led to conclude that under the facts and circumstances here shown by the evidence, appellee's conduct in storing its motor and cars in a seemingly safe position in the tunnel was thereby exercising but the right of control and use over its property consistent with a due regard for the rights of all others, children included, in respect to such property, and that in so doing it did not bring itself within the

326

doctrine of the turntable cases, nor assumed the exercise of ordinary care against either infants or adults being injured thereby while trespassing on its premises, and that as there was thus imposed upon it no duty, it could not therefore be guilty of any culpable negligence; therefore as there could result no such thing as the alleged negligent performance of a nonexisting duty, the statement alone of the facts of this case, it would seem, is sufficient to demonstrate that the appellant has no cause of action. Thompson v. Cumberland Tel. & Teleg. Co., 138 Ky. 109, 127 S. W. 531; Hermes' Adm'r v. Hatfield Coal Co., 134 Ky. 300, 120 S. W. 351, 23 L. R. A. (N. S.) 724; Mayfield Water & Light Co. v. Webb's Adm'r, 129 Ky. 395, 111 S. W. 712, 33 Ky. Law Rep. 909, 18 L. R. A. (N. S.) 179, 130 Am. St. Rep. 469; Louisville & P. Canal Co. v. Murphy, 9 Bush, 522; Schauf's Adm'r v. City of Paducah, 106 Ky. 228, 50 S. W. 42, 20 Ky. Law Rep. 1796, 90 Am. St. Rep. 220; Henry Smith v. Walker D. Hines, 212 Ky. 30, 278 S. W. 142, 45 A. L. R. 980; Coon v. Ky. & I. T. R. Co., 163 Ky. 223, 173 S. W. 325, L. R. A. 1915D, 160. We are of the opinion that the case at bar comes within the principle of these cases.

The judgment of the lower court in giving a directed verdict is accordingly approved, and its judgment affirmed.